ON REHEARING
MARVIN, Judge:
A rehearing was granted to allow a five-judge panel further factual review and consideration of the standard of the burden of proof, whether statutory (Art. 73, CJP, preponderance of the evidence) or constitutional (Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), clear and convincing).
On rehearing, we find that the evidence does not reach even the statutory standard and that the trial court was clearly wrong in concluding that one or both children had been sexually abused by their mother. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We reverse and set aside the judgment of the City Court sitting as a juvenile court which terminated the mother’s parental-custodial right under LRS 14:403 and CJP Art. 13(14)(a).
SUMMARY OF FACTS
The circumstances of the case that are detailed in the original opinion and dissent shall not be repeated except to demonstrate or articulate why this court concludes on rehearing that the trial court was clearly wrong. Our review reveals these chronological events:
May 1984 — After divorce, mother and children move to Shreveport from Monroe. Father pays child support. Children begin alternating weekend visits with father under joint custody decree.
December 1984 — Children begin psychiatric therapy in Shreveport which continues through June 7, 1985.
March-April 1985 — Father complains of KLW’s use of sexually explicit words. Mother tells father about RW’s having cystitis and undergoing treatment by a Shreveport pediatrician.
June 7, 1985 — Children arrive for two-week visit with father.
June 13,1985 — Father consults with lawyer, private detectives, and takes children to Monroe psychiatric social worker (Meri-wether). Meriwether’s interview with the children before the tainted and suggestive doll-play interview with the children on June 19 does not refer to sexually explicit words or improper conduct by either child. Interviews of the children after June 19 by Meriwether and others are at best equivocal in this respect. Meiwether’s report of August 22, 1985, is attached to the dissent as unpublished appendix B and contains narrative recitations of her interviews with *666 the children before and after June 19,1985. Meriwether saw the children 23 times, the paternal grandparents 12 times, and the father and stepmother eight times from June 13 through August 20, 1985. Meri-wether interviewed the mother one time during this period. RW admitted to Meri-wether that she had masturbated.
June 19, 1985 — Sheriff’s deputies conduct the tainted and suggestive doll-play interview with each child.
June 20, 1985 — Ur. Beauregard, Monroe pediatrician, examines both children specifically for any indication of sexual abuse. Ms. Futch of DHHR interviews children after viewing the June 19 doll-play interview by sheriffs deputies.
June 25, 1985 — Trial court signs instanter order under LRS 14:403 on DHHR petition and affidavit by Ms. Futch, DHHR employee, to divest mother of custodial rights and to grant physical custody of children to father.
June 28, 1985 — After hearing, temporary physical custody granted to paternal grandparents.
July 22,1985 — Dr. O’Boyle, Monroe pediatrician, examines RW, who is again complaining of symptoms of cystitis. Dr. O’Boyle finds tear in RW’s hymen. Staffing report of August 23, 1985, states that RW told Dr. O’Boyle she did this to herself.
August 22, 1985 — Meriwether report filed. Meriwether’s report concludes in part that
[KLW] has contradicted himself ... His sister [RW] emphatically denied that her mother had involved herself sexually with either of them and [KLW] indicated his mother was angry with him when he attempted to touch her vagina or roll on top of her. * * *
In the absence of any substantial evidence that this mother did indeed molest these children, I would strongly recommend that the children be returned to the care of their parents as soon as possible. * * *
August 23, 1985 — Staffing report filed. This report, in part, concludes:
It is not known who abused RW. It is possible that the mother could have done this [or] allowed someone else to do it.
September 10,1985 — After trial, physical and legal custody granted to father with six months “courtesy supervision” to be exercised by DHHR.
Meriwether’s interview of June 13 states that the father’s “primary concern was the possibility of sexual abuse of the children. [The father] is also desirous of having the children live with him during the school term and have reasonable visitation with the mother. [The father] alleges that the mother was gone so much when KLW was an infant that KLW [was] bonded to [him].”
KLW was described by Meriwether as a “child of superior intelligence, who wanted to live with his father. KLW said at times that he plays ‘naked games.’ His mother has a towel around her to make me not see her naked [and] that if he told his mother he could see her naked, she would wash his mouth out with soap.”
RW told Meriwether that the only game she played with KLW and their mother was “tickle-bug.” This game was played before bedtime, during which time the children would run from their mother when she tickled and chased them, eventually catching them and kissing them. RW said she and KLW liked to watch TV in bed with their mother who would insist that they go to their own beds to sleep.
In later interviews, when specifically questioned about allegations of sex play between her mother and either or both of the children, RW “insisted that KLW was not telling the truth.” When Meriwether later asked KLW about RW’s remark that he was not telling the truth, Meriwether reported that KLW said that he had touched his mother’s vagina which made his mother “mad” and that KLW then denied that his mother had ever touched his penis. In this respect, Meriwether’s report of August 22 concludes:
KLW has contradicted himself in describing what took place ... RW may be *667 entirely truthful when she says, “I don’t know [how my hymen was torn] ... The entire experience [too many interviews, doll-play, and emphasis on sexual activity] has been emotionally shattering for both these children.
The staffing report of August 23 states, however, that KLW had stated to sheriffs investigators and to Ms. Meriwether that sexual activities occurred between him and his mother in Shreveport. This statement simply is contrary to the transcript of the interviews with the children on June 19 (the tainted doll-play interview with the sheriffs deputies) and contrary to the Meri-wether report of interviews before June 19. The June 19 interview is quoted at length in the dissent and need not be repeated here. Meriwether’s report of interview(s) before June 19 is published as an appendix to this opinion on rehearing. We emphasize, however, that in the only mention by KLW, when coerced or suggested by the deputies in the June 19 interview, of any game played without his clothes on, he refers not to his mother, but to his father and his siep-mother as participants, and as to the event taking place in Monroe, and not in Shreveport.
We must conclude therefore that the trial court was clearly wrong in finding, expressly or impliedly, that even a preponderance of the evidence showed that either of both KLW and RW had been sexually abused by their mother.
The tear in RW’s hymen was at best an equivocal finding and not indicative of abuse by others, even according to the Monroe pediatricians. RW was at least twice affilicted with, and received medical treatment for, cystitis. RW told at least two of her inquisitors that she had masturbated or had done it to herself. RW insisted that any stories of sexual activity between her and her mother or her brother or anyone else was not true. The tear in RW’s hymen was at least two weeks old when Dr. O’Boyle examined RW on July 22, 1985. Dr. O’Boyle indicated such tears heal in about six weeks. RW and her brother had been in Monroe with their father since June 7, 1985. KLW did not unequivocally say to any interviewer on or before June 19, 1985, what the staffing report of August 23, 1985, states that he says. Even the staffing report speaks only of possibilities, while assuming, and perhaps falsely, that RW was sexually abusd by someone.
The lay and opinion evidence on behalf of the mother is fairly summarized on pages 5 and 6 of the original opinion. The details of the evidence which is here summarized is fairly stated in the dissent to the original opinion. On this evidence, which we adopt, when we view it in its entirety, we must reverse the judgment because it does not prove the State’s case even by the preponderance standard of Art. 73, CJP.
As an appellate court, we give great weight to factual conclusions of trial courts that are based on reasonable evaluations of credibility and reasonable inferences of fact. We are not required by this principle, however, to affirm a trial court’s conclusion that some testimony, however equivocal and in the face of other contradictory testimony from the same witness who is under four years of age, reaches the legal standard of either preponderance of, or clear and convincing, evidence. Arcen-eauoo, supra. See West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979); McCoy v. Franklin Parish Police Jury, 414 So.2d 1369 (La.App.2d Cir.1982).
Where the evidence is legally insufficient to prove that the children were sexually abused by, or through the neglect of, their mother, the juvenile court has no authority to render any judgment relating to the mother’s custody. See State in Interest of Purcell, cited in dissent.
At the father’s cost, the judgment is REVERSED AND SET ASIDE, and the State’s petition is dismissed.
APPENDIX B
LOUISIANA BOARD CERTIFICATION # 111
*668 QUALIFIED SCHOOL SOCIAL WORKER #76
PATRICIA P. MERIWETHER, M.S.W., A.C.S.W.
PSYCHIATRIC SOCIAL WORKER 2107 HONOR ST„ SUITE E MONROE, LOUISIANA 71201
TELEPHONE 300-2504
DATE OF REPORT: August 22, 1985
DATE OF INITIAL EVALUATION: June 13, 1985
IDENTIFICATION:
K-L-W_, born, August 13,1981.
L_is a three-year old white male, who will be four two months from today. He weighs 35 lbs. and is three feet tall.
R_W_, bom 2-21-80, is a five year old white female.
-and_are sister and brother.
Father: K_L. W_
Mother: J_L_W_and currently a resident in Psychiatry at LSU-Shreveport Medical School.
Stepmother: D_ S. W_ who is a housewife and is not employed outside of the home.
Stepbrothers: John, Paul and Charles David, all over 18 and residing in Texas. NUMBER OF SESSIONS FROM JUNE 13 through AUGUST 20, 1985:
With Father 3
With Stepmother 5
With L_12
With R_11
With Paternal Grandmother 9
With Paternal Grandfather 3
With Mother 1
PRESENTING COMPLAINT:
The father and mother of these children are separated and divorced. The father has remarried, the mother has not. The mother has had primary domicile since she moved to Shreveport in 1984. Prior to that time, the father had the children every other night and all day Sunday. Currently, he has the children alternating weekends and for a lengthy period in the summer.
Dr. W_states that he has become concerned about the two children because of their preoccupation with genitalia and nudity. He alleged that L_had said, “Daddy, I want you to take your clothes off so I can crawl all over you naked.” Dr. W_ further indicated that L_ had said he played naked games with his mother, and that L_had exposed himself to his sister on two occasions while in the father’s home.
The father further indicated that L_had asked him if he would sleep with the mother again and if he, the father, slept with the stepmother.
R_ had said that she knew two bad words, vagina and penis. It was further reported that R_had said, “Let’s take our clothes off and just sit around in our slips.” When watching TV, R_ had commented to her father, “Oh, isn’t she sexy.” or, “Daddy you’d like her, she’s sexy.”
The father expressed great concern because the mother has apparently been diagnosed as having Bi-Polar Disorder and is currently maintained on Lithium. The father alleges that the mother becomes extremely paranoid and he does not consider this a good environment for the children.
Dr. W_ alleged that the mother had always had full-time help; however, the children were sent to a nursery all day and the mother hired a sitter to care for them after they left the nursery. Currently, the mother is said to have a live-in Filipino housekeeper whose name is Maria. The father believes that Maria is good with the children and states he has noticed that their manners have improved and they are neat and clean when he picks them up.
The primary concern expressed by Dr. W_ and the stepmother relates to the possibility of sexual abuse of these chil *669 dren. Because of this concern the father decided to seek professional help for the children. He is also desirous of having the children live with him during the school term and have reasonable visitation with the mother. He alleges that the mother was gone so much when L_ was an infant that L_“is bonded to me.”
The following information was obtained in sessions with the children, prior to the video tape session with the sheriff’s deputies.
L_was three years and ten months old at the time of the initial interview. He has reddish, brown hair and blue eyes. He is left-handed and quite verbal. It soon became apparent that he is a child of superior intelligence. When asked about his living situation, L_said, “Mom is in Shreveport, but I wish I didn’t live there. I wanted to be with my Dad. Mom never can play with us, ’cause she’s big; she’s gone most of the time.” I learned that Maria is a live-in housekeeper and stays with the children. Both children indicate that they like Maria.
L-said that sometimes he slept in his mother’s bed. “It sounds like a monsters coming and I gotta hold my eyes open to see what’s going to happen.” He thinks that there are black horses that are mean, but says, “It’s a dream.” He then stated that his mother would not let him stay in her bed, that he had to go back to his bed. At times, he plays “naked games” on mother’s bed. His mother has a towel around her “to make me not see her naked.” He further stated that if he told his mother, “I can see you naked,” his mother would wash his mouth out with soap. I asked him what his father would do if he said that to him. He said his daddy would spank him. He reiterated that he wanted to stay with his daddy because “my Mom doesn’t stay with me that much.” L_said Maria puts him to bed because his mamma is gone. At his father’s house, D_ and his father put him to bed and he remarked that his daddy is home nearly every night. In regard to meals, L_describes similar situations in both households. Maria taking care of breakfast and lunch and either Maria or mother cooking dinner, and at his father’s house both D_ and his father cook.
L_indicated that his mother was tired all the time and that she cried a lot because, “Dr. Spires is gone. He came to the house to see Mom, but he tells lies. He is her boyfriend and Mom cries because he doesn’t come by enough and he just does everything he wants to do.” R_indi-cated that she did not like Dr. Spires because “we had to stay in Mommie’s room all night.” She said she wanted her mother and her daddy and not Dr. Spires.
L_also said that he liked to slide around on his mother, but “she won’t let me roll over on her.” He indicated that he never slept or napped with Maria.
R_is a rather large five-year-old girls with brown hair and eyes. She indicated that she was to stay with father 14-days and that she felt sad because she has to go back and forth between her parents. She referred to the house on Myrtle street where she, her mother and L_ lived when they were in Monroe, as the best place for her to live. She, too, told me that her mother has to be gone a lot. R_ gets lonely. She repeated that she would rather live on Myrtle street because, “it feels like when we leave that house, it’s sad.”
R_said her mother didn’t like to be with her father and R_does not know why. She also indicated that, “mother gets upset and cries a lot.” R_and L__ tell her to stop crying. R_ spontaneously remarked, “I am worried.” She worries about her mother and father and alleges that L_told her that her mother might get killed. R_has bad dreams and gets scared, because she dreams about, “the nothing and the shadow.” These dreams involve a boy being taken to quicksand and he and his horse sinking in the sand and the shadow trying to get R_
When asked about games she and her mother might play, R_ said the only game her mother played was “tickle-bug”. Usually, she and her mother have on their nightgowns and L_is in his T-shirt and undershorts, and the game consists of *670 mother trying to tickle L_ and R_ and they will run away and mother will then capture them and kiss them. R_ says she and L-are crawling, running or skipping and they are all laughing when they play this game. R_says that she likes to sit around in her nightgown and that her mother and Maria also like to do this. When asked about sleeping arrangements, she said, “I sleep in my own bed; L_sleeps in his bed, but we do get in Mom’s bed a lot.” They like to get in bed with their mother and watch TV, but the mother insists that they go to their own bed to sleep.
R-would frequently say, “I’m not gonna tell you anything except my stepbrother’s picture scares me. All I’m scared of is that picture of one of my brothers. Every-time I go in my room.” I later learned that the picture was taken when the stepbrother was about six years of age. R_could not tell me the name of the stepbrother in the picture that frightened her. The picture was of all three of the stepbrothers. At my suggestions D_removed the picture from R_room.
R_ also seems to feel that she has lacked some nuturing. She complained that her mother and Maria tell her she is too heavy to hold. Sometimes her mother will read to her but most of the time mother is at work and, “I hate it.” In response to my question she indicated that her father has to go sometimes at night but her mother has to go all the time, and mother is tired all the time. When asked about crying, she said, “I’m the one who cries a lot.” I asker her, “What do you cry about?” She said, “Everything.” And then told me that she cried because Maria would send her to her room and because her mother is gone a lot.